Good morning, Your Honors. May it please the Court, I'm Krista Hart. I represent Mr. Ifenatuora. And my goal is to represent or to reserve two minutes for rebuttal. I think the first question here is whether the Supreme Court case of Chayadez precludes any further consideration of this case because they held that the rule of Padilla is not retroactive. And the rule of Quan, which is a Ninth Circuit opinion from 2005, provides the Chayadez ruling, and that's the case upon which Mr. Ifenatuora primarily relies. So the rule of Quan provides Chayadez for a number of reasons. First, in the section of Chayadez where the Court is addressing the ruling of Padilla and whether it's retroactive, they conclude by saying, all we say here is that Padilla's holding that the failure to advise about a noncriminal consequence could violate the Sixth Amendment would not have been, in fact, was not, apparent to all reasonable jurists prior to our decision. So they're saying that all we're deciding is the omission aspect, that an attorney's failure to say anything about immigration consequences is all they're addressing. And then in Section 3 in Chayadez, the Court goes on to talk about Quan, Cuoto, and other cases that have discussed whether an attorney has an obligation to discuss immigration consequences. And they distinguish Quan on the basis that it addressed a general misrepresentation. And if you look at the Quan ruling, the Quan ruling does specifically ultimately hold on two different bases. It says, first, that as a criminal defense attorney, you have an obligation under the Sixth Amendment to advise your client about immigration consequences or to be correct. But they also say, but also basic standards for competence that are general to the profession indicate that if you are going to make representations to your client that you have an expertise and are knowledgeable on an issue, you have an obligation to provide correct advice. So that's what the Chayadez Court relied on when they distinguished Quan and Cuoto and other cases. Those decisions reasoned only that a lawyer may not affirmatively misrepresent his expertise or otherwise actively mislead his client on any important matter, however related to a criminal prosecution. They say that Quan, Cuoto, the other cases, coexisted happily with precedent from the same – from same jurisdictions and almost all others, holding that deprecation is not so unique as to warrant an exception to the general rule that a defendant need not be advised of the collateral consequences of a guilty plea. And then the – Counsel, Judge Gould – Judge Gould, with a question for you, please. Yes, Your Honor. What is the particular misadvice that you contend was given? And put the stress on the misadvice rather than non-advice. And the misadvice given to Mr. Ifenitore by trial counsel was that, quote, unquote, only theft cases resulting in a prison sentence of more than five years would result in deportation. And according to Mr. Ifenitore, trial counsel specifically said you don't have to worry about immigration consequences because the court addresses all clients, born-born defendants, about potential immigration consequences. And prior to the enactment of the 1996 immigration reform law, five years was the triggering time limit. A felony that was five years or longer was considered an aggravated felony. However, after September 30th of 1996, when President Clinton signed the law into effect, that dropped from five years to one year. Likewise, the limit based on the amount of loss dropped from 200,000 to 10,000. So that's the specific misinformation that trial counsel provided to Mr. Ifenitore, that he did not have to worry about deportation. It was not likely in this case. The ---- Thank you. Sorry, Judge Gould. The trial court, though, didn't it determine that he wasn't believable. And so it was just kind of left then if it didn't believe him with what the lawyer said. And I agree the lawyer didn't remember much. But he did say he had a standard practice to inform clients who are not citizens that convictions of certain crimes could place their immigration status in jeopardy. So if he said anything, that's what he would have said. I have a number of issues with that statement and testimony by trial counsel. Trial counsel, in a declaration that was prepared by government counsel and signed by defense counsel, said it was his practice to advise defendants that a conviction of a fraud exceeding $10,000 would trigger ---- was an aggravated felony and would trigger immigration consequences. The problem with that is that does not take into account the change of law between September 6th of 1996, when Mr. Ifenitore pled guilty, and January 17th of 1997, when he was ultimately sentenced. So this generic statement that that's my common practice is not particularly helpful in this situation. What is also not particularly helpful here is when questioned about specifically who came up with that $10,000 amount in the declaration that you signed, trial counsel says, you know, as I sit here today, I have no recollection where that $10,000 amount came from, which, as a practicing criminal defense attorney today, one would absolutely know what that $10,000 amount threshold is. And so the fact that trial counsel has no recollection of the client's intent to do this, the client specifically, has no recollection of discussing this with the client, possibly was confusing Mr. Ifenitore with some other client he represented, and indicating that he doesn't know where that $10,000 came from, the $10,000 amount came from, and that nothing in his file indicates that he discussed this change in the law with Mr. Ifenitore, and given ---- I mean, you can't find it there, so you have to rely upon the appellant's statement. Is that right? That's correct. And the appellant's statement, while I do understand that the court found him not to be credible, there are aspects of his testimony that I believe do support credibility, and that has to go with what occurred prior to this case. For example, he was arrested, prosecuted, and convicted in Maryland in 1993 of fraud-related charges. His attorney told him, don't worry, you won't be deported. Again, explained the threshold amounts, et cetera. And after Mr. Ifenitore served his sentence, he was surrendered to immigration custody. Immigration court in 1993 initiated immigration and deportation removal proceedings, but then ultimately exercised their discretion to not do that. So for Mr. Ifenitore to believe trial counsel in 1996 that he wouldn't be deported is not unreasonable. Well, can ---- just on that line, there was one part of the record that I guess I found persuasive against your position. I just wanted to get your response to it. It's the sentencing hearing itself. Yes. So it's post-Iraira. Yes. And your client's lawyer then said that he agreed with the statement, I guess, by the probation officer when they were discussing whether a restitution order should be entered. Your client's lawyer at the time said, I agree with Mr. Griffin that my client will simply be deported. And then he testifies at the hearing, if I remember, that he would never have made that statement so definitively. He simply will be deported unless he had first discussed that with his client. And I guess I thought those two things together suggested, or at least supported, the district court's finding that actually, in the interim between the guilty plea and the sentencing, your client's lawyer must have had some discussion with him about not ---- it's not just a possibility now. It is going to happen. And the statement he made at the sentencing seems to support that. Yes, Your Honor. The problem with that, though, is the way the court couched that is the court couched that in that he would be surrendered to immigration for procedures, you know, as authorized by immigration law. And the problem with that is that the immigration law had changed. And so ---- I'm just looking at the transcript. And I also will just tell you what Mr. Griffin, the probation officer, said. They're discussing restitution, right? And whether ---- Mr. Griffin was the assistant U.S. attorney. Oh, I'm sorry. The assistant U.S. attorney. Okay. But they're discussing whether it even makes sense to impose a restitution order because this person might not even be here. And so the AUSA says it's my understanding that after he's served his sentence here, he will be deported back there. And then the defense lawyer said, yeah, I agree with Mr. Griffin. My client will simply be deported, period. Not, well, he's going to be surrendered to immigration authorities, and then we're going to make arguments, blah, blah, blah. He just says he's not going to be here, so, Judge, please don't ---- there's no point in imposing a restitution order. And I'm saying we're reviewing under a clearly erroneous standard, I think, the district court's factual finding that there simply was no misadvice given. And I'm asking you, why doesn't that statement there amply support the district court's finding? Because Mr. Bachman doesn't have any recollection of what occurred. And it's not clear. I understand that he testified that he probably would not have said that had he not known that to be a fact. But that doesn't disprove Mr. Ifnatura's assertion that Mr. Bachman never told him that. Right. But, you know, but he wasn't found credible. That's my ---- I guess that's my problem with your position, is that your client's testimony was found explicitly not credible, and so then, as Chief Judge Oliver mentioned, we then have to look, okay, well, what's left from which your client could prevail on this claim? And all we have is what the lawyer said. And I'm saying the two things I see from his former lawyer fully support the district court's conclusion. And all I can answer to that is that because Mr. Bachman doesn't really have any recollection about what occurred and whether he discussed it with Mr. Ifnatura or not undermines that statement. Okay. You are over your time, but we'll give you a couple minutes for rebuttal. Let's hear from ---- Judge Watford, I'd like to ask your counsel one question. I'll try to make it very quick and ask her to respond in a few seconds or a half minute. But is there significance in terms of our procedures for considering a writ of the defendant's testimony many years after that was done? In other words, how long can a person wait to make a collateral challenge? Your Honor, this Court has held that 40 years is not unreasonable in the case of Hirabayashi. So it's not necessarily the amount of time that's dispositive. It's whether the defendant has a sound or valid reason for not challenging it earlier. And in the Chaita's case, that was a quorum nobis. She waited, I believe, five years after her conviction became final. Here ---- So what was ---- what were his sound reasons to wait 14 years here? For Mr. Ifnatura is that immediately following his release from custody on the criminal conviction in this case, he was surrendered to the deportation proceedings. He had an attorney, John Crowe, who represented him in the immigration proceedings. After hearing and meeting with Mr. Ifnatura, Mr. Crowe determined that the best way to go forward was to challenge or request deferral of the removal proceedings based on the Conventions Against Torture. And Mr. Crowe prevailed for Mr. Ifnatura on that claim. And the immigration judge set aside or deferred the removal order. Then Mr. Ifnatura was released from custody. He moved from Sacramento to New York to North Carolina. And as the government was attempting to file motions and reopen the immigration case, there is a very long and complicated history about not being served, procedural errors, et cetera, until finally in 2009, when the government arrested Mr. Ifnatura, placed him in custody, and the attorneys from Jones Day in Atlanta took the case pro bono. And that case is still pending. And if I'm not mistaken, there's a hearing today following remand from the immigration court on the status of Mr. Ifnatura. So ---- Roberts, I think you've answered my question. Thank you. Okay. We'll hear from the government now. Good morning, Your Honors. Robert Tice for asking for the United States. There are three procedural bases upon which this Court can affirm, and there are two substantive bases. Even if this Court were to assume that Mr. Ifnatura gets over all of his procedural hurdles, if you will, if you go right to the merits, it was Mr. Ifnatura's burden to establish misadvice. The district court entered very specific findings, which were well supported by the record, finding his testimony to be wholly incredible in connection with the misadvice. It'd have to be almost wholly incredible, though, wouldn't it? But indeed, there were a whole host of reasons why that the district court reached the conclusion it did, and specifically reached the conclusion in connection with the allegations of purported misadvice. And Mr. Ifnatura offers no reasons why the district court erred in that regard. And as it was Mr. Ifnatura's burden to put forth evidence, it was his burden to establish the claim, there is simply no evidence in the record with which to find that there was misadvice, and he fails to establish ineffectiveness on that ground as well. Now, he has also utterly failed to establish any prejudice. All that Mr. Ifnatura put forth were perfunctory claims, well after the fact, that had he known about the deportation consequences, he wouldn't have accepted the plea, and he would have proceeded to trial. He has not demonstrated, however, that it would have been at all rational at the time for him to reject the plea. And indeed, the state of the record is as follows, that the government at the time, way back in 1996 and 1997, had a strong case against Mr. Ifnatura, including his own Mirandized statements. Neither then nor now has Mr. Ifnatura suggested that he had any viable defense. Well, I don't think that's the relevant question. I mean, someone can always decide to roll the dice, even if they think they might ultimately be convicted, if they know that what's going to follow is something that's even worse than maybe being locked up for a few years. I think the more relevant question is what benefit was he getting by virtue of the plea deal? Well, the benefit was this, Your Honor. The government at the time had pledged, and at the time of sentencing stayed by its pledge, to recommend a guideline sentence, to recommend a low-end sentence, and to not bring additional charges against Mr. Ifnatura. And what I think is particularly telling — When you say not additional charges, but did he get any break, so to speak, based on charges that were filed against him? He received a low-end sentence, Your Honor. But if he'd gone to trial, he'd be facing the same thing? He would have been — Except for acceptance. He would have been facing additional charges and the potential for a higher guideline range. As to what additional charges were being contemplated and were about to be brought, I know not at this point. But I do know there was an explicit discussion between defense counsel and the government on the record before the district court, in which government counsel made it clear that if Mr. Ifnatura did not proceed to accept the plea that had been offered, that it was the government's intention to supersede. But there's one more point that's quite salient in connection with prejudice, and that is this. The government believes that it was certainly the case, at the time of sentencing, that Mr. Ifnatura was well aware that deportation was coming down the pike. And I think this Court has underscored some of those reasons. Not only did the probation office tell him in the PSR, which he reviewed, that he was going to be handed over to immigration authorities for the purpose of deportation. But his defense counsel, the prosecutor, and even the judge all made similar statements to him indicating that after he served his sentence, he was going to be handed over to immigration authorities for the purposes of deportation. Now, you would think that at that point in time, if it was wholly unfathomable to Mr. Ifnatura that he suffered the risk of being deported, you'd think that he would have said something. He would have peeped anything, but he said nothing. I don't think that's a fair characterization of his claim at all. I mean, everybody knew there was a risk. His complaint is that he was told when he pleaded guilty that there was a risk. But by the time he was sentenced, it was a certainty. And there's a huge difference there, right? There is a difference there. But indeed, the record suggests that at the time of sentencing, he was told with virtual certainty by the prosecutor and defense counsel that you are going to be deported. At that point in time, if he had honestly been acting under some sort of misimpression as to what was coming down the pike, he should have, if he honestly viewed that as being an unfathomable consequence, at least said something at the time of sentencing, which is a logical segue into the whole timeliness claim. The government does take the position to answer the question that was initially asked by Judge Gould that, frankly, this entire writ is untimely because the trial judge didn't address that issue. That's correct. The trial judge, to be clear, only addressed the issue of whether or not there was misadvice. The trial judge did not address the prejudice issue. The trial judge did not address whether Mr. Affinitura had valid reasons for his delay. The trial judge did not address the laches defense that the government asserted. And the trial judge bypassed the very significant issue of whether or not there should be retroactive application here. All very interesting questions. I think that the government has arguments strongly in favor on all of those points, but the easiest basis for affirmance is the one I indicated initially. But another firm basis for affirmance is indeed on timeliness grounds. Mr. Affinitura became aware in 1999 that he was deportable based on the Eastern District of California conviction. Now, his removal was deferred. But at that time, DHS made it perfectly clear that they were going to challenge that deferral, and they did. At that point in time, Mr. Affinitura had reason to conclude if he had been misadvised, that, in fact, he had been misadvised. And he could have ---- But it's not that the conviction would subject him to potential deportation, right? It's that by virtue of the nature of the conviction, he was basically disqualified from virtually every form of discretionary relief that might otherwise have been available. And that's my point. But that was made crystal clear to Mr. Affinitura in 1999 when the immigration court ---- Because he kept getting. He got discretionary relief. It's kind of somewhat ironic, isn't it, that, in fact, the very thing that you're arguing he should have known about, right, that he was going to be deported with absolute certainty by virtue of the conviction, it actually didn't turn out to be true. He kept getting deferred for years and years and years. He got deferred until 2006. And in 2006, the DHS motion to terminate deferred removal was granted. At that point, his one last hope under CAT was taken away. And at that point, at the very latest, the government contends that Mr. Affinitura knew that he was being deported. He knew that his CAT claim had been rejected. And he had an obligation at that point, if he had honestly suffered from this advice, to file his claim. Instead, in 2006, he did nothing. He waited all the way until 2010. Indeed, he waited 10 months even after he was apprehended by immigration authorities to file his claim. Given that extended period of time, the government contends that he has failed to demonstrate valid reasons for his delay in timely filing his claim. And for similar ---- that he may be deported or might be deported in a context where he would be deported. Would that be misrepresentation? If he had ---- if assuming for argument's sake the advice he was given was solely you might be deported, that could constitute ineffective assistance of counsel. But the important point here is, is that is not the proof that's been adduced before the Court. And another important point here is even if one were to assume there were actionable misadvice, defendant must still demonstrate prejudice. And the government contends that on this record, he has failed to demonstrate prejudice. Indeed, one of your sister circuits, the Eighth Circuit, on very similar facts said that when a defendant seeking extraordinary relief had been advised that he was going to be deported in the PSR and had read the PSR, that that foreclosed a finding of prejudice. And for that reason as well as other reasons, the government believes that even if this Court were to assume there were misadvice, which I certainly wouldn't urge the Court to do, there would still be a failure in connection with the prejudice prong. Now, would the Court like me to address the question of retroactivity? All right. Well, that being the case, I thank Your Honors for your time. Okay. Thank you very much. We'll give you, what did I say, two minutes for Ravel? Thank you. A couple things. One, it's difficult to project onto a defendant in a criminal case the type of responsibility that the government is projecting here. For example, that Mr. Ifinitura should have somehow jumped up during the sentencing proceeding and said, wait, wait, wait, wait, wait, when in Mr. Ifinitura's mind, his attorney had said, look, immigration will be discussed at sentencing. It's discussed with all foreign-born defendants, so don't worry about it. So I don't think the fact that Mr. Ifinitura didn't jump up at that moment is dispositive of anything. As far as the timeliness goes, this is the chronology is laid out in my brief. But after the initial defer, the government tried twice, and the immigration court twice, first in 2003, then again in 2006, granted the government's motion in absentia, allowing, ordering for Mr. Ifinitura to be deported. And both times, the appellate court, the BIA, said no, that was done in error, it was incorrect. And it's not until 2009 that that motion is, it began in 2009, and it's still proceeding, that that motion was actually being litigated. So the government's effort back in, I think it was 2001, to withdraw the, to terminate the deferral is taking 13 years to get to an actual immigration court. So that's, I mean, if the immigration attorneys and the immigration court have a difficulty understanding the procedures of Mr. Ifinitura's case, I'm not sure how a layperson is supposed to understand all the intricacies and nuances of immigration law to jump up and say, hey, I'm supposed to do this. Can you just clarify one thing for me? It may be clear to my colleagues, but does he have two convictions of moral turpitude apart from the conviction involved here? What is his situation? He does have a criminal record, and I know for sure that the conviction in Maryland from 1993 is a crime of moral turpitude, and I believe he has one other State conviction that possibly could. Would that affect the issue of prejudice at all here? Yes, I think it would. I think it would because the difference would be, though, and those were all prior convictions. This is the 1997 conviction here, at issue here, is his last criminal conviction that I'm aware of. And so all of those things occurred prior, and like Your Honor said, he was always granted discretionary relief to remain in the country. So I think if Mr. Ifinitura learned in 1997 that he would conclusively be presumed deported, he would have, as you said, rolled the dice, gone to trial, and tried. And the one other issue I would like to address would be, you know, the government talks about that in the pre-sentence report, Mr. Ifinitura knew he would be deported. But what the pre-sentence really says is that upon completion of his sentence, he will be turned over to immigration authorities for deportation in accordance with the established procedures provided by the Immigration and Naturalization Act, which that had changed if ordered deported, which indicates that it's a possibility, but not that he was going to be deported. And on that, I'll submit. Okay. Thank you. Thank you very much, counsel.
judges: Oliver, Gould, Watford